Approved: _____   **19 MAG 3013**
Aline R. Flodr
Assistant United States Attorney

Before:  THE HONORABLE KATHARINE H. PARKER
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - - x
                                    :  **COMPLAINT**
                                    :
UNITED STATES OF AMERICA             :  Violation of 21 U.S.C. §
                                    :  846
        - v. -                       :
                                    :  COUNTY OF OFFENSE:
GREGORY KONNY,                       :  NEW YORK
                                    :
                Defendant.           :
                                    :
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

MICHAEL D. MULLER, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

**COUNT ONE**

1.  From at least in or about February 2017 through at least in or about December 2018, in the Southern District of New York and elsewhere, GREGORY KONNY, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2.  It was a part and an object of the conspiracy that GREGORY KONNY, the defendant, and others known and unknown, would and did distribute, dispense, possess with intent to distribute and dispense, and cause to be distributed and dispensed, a controlled substance, outside the scope of professional practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substance that GREGORY KONNY, the defendant, conspired to distribute and dispense, possessed with intent to distribute and dispense, and caused to be distributed and dispensed, outside the scope of professional practice and not for a legitimate medical purpose, was mixtures and substances containing a detectable amount of oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

4. I am a Special Agent with the DEA. I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

5. Since in or about April 2016, the DEA, together with the Yonkers Police Department, has been investigating a narcotics distribution organization operating in and around Westchester County, New York. Through this investigation, law enforcement has learned that GREGORY KONNY, the defendant, a licensed pharmacist, illegally supplied members of the narcotics distribution organization, including a co-conspirator not named herein ("CC-1"),[1] with oxycodone. Following the arrest of members of the narcotics distribution organization in or about March 2017 in the Southern District of New York, KONNY continued to distribute oxycodone with others by using his pharmacy, South Franklin Pharmacy, Inc., which did business as Aneddona Pharmacy (the "Pharmacy"), as a front for the diversion of controlled substances.

---

[1] CC-1 was charged in or about March 2017 in the Southern District of New York with conspiracy to distribute and possess with intent to distribute controlled substances, including cocaine, oxycodone, and Xanax, in violation of Title 21, United States Code, Section 846.

2

6. Based on my participation in this investigation, and my training and experience, I have learned, among other things, the following:

   a. Oxycodone is a highly addictive, narcotic-strength opioid that is used to treat severe and chronic pain conditions, such as post-operative pain, severe back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses. Oxycodone can be legitimately obtained from most pharmacies with a prescription written by a treating physician, and is typically dispensed in tablet form, with dosages varying between 5 milligrams and 80 milligrams.

   b. Oxycodone prescriptions are in high demand and have significant cash value to drug dealers. Oxycodone tablets can be resold on the street for thousands of dollars. For example, 30-milligram oxycodone tablets have a street value of approximately $20 to $30 per tablet in New York City. A single thirty-day prescription for 180 30-milligram tablets of oxycodone could net an illicit distributor in New York City $5,400 in cash or more.

### The Defendant's February 2017 Unlawful Distribution of Controlled Substances

7. Based on my participation in this investigation, my review of recordings and electronic communications obtained pursuant to judicially-authorized wiretaps, my discussions with other law enforcement agents, and my review of surveillance reports, I have learned, among other things, the following:

   a. On or about February 15, 2017, CC-1 and another co-conspirator not named herein ("CC-2"),[2] engaged in a series of phone and text communications regarding a narcotics transaction. Specifically, CC-1 agreed to purchase 500 30-milligram tablets of oxycodone and 1000 Xanax tablets from CC-2. CC-2 texted CC-1 at approximately 12:21 p.m. confirming that CC-2 would meet CC-1 in Manhattan the following day to provide the 500 30-milligram tablets of oxycodone and 1000 Xanax tablets.

   b. On or about February 16, 2017, at approximately 1:51 p.m., CC-1 called CC-2 to confirm that the transaction would take place that day. CC-2 informed CC-1 that

---

[2] CC-2 was also charged in or about March 2017 in the Southern District of New York with conspiracy to distribute and possess with intent to distribute controlled substances, including cocaine, oxycodone, and Xanax, in violation of Title 21, United States Code, Section 846.

3

CC-2 had texted CC-2's supplier and confirmed that the supplier would provide CC-2 with narcotics for the deal.

   c. On or about February 16, 2017 at approximately 5:30 p.m., DEA agents performing surveillance of CC-2 observed CC-2, driving a blue Nissan Sentra, enter a Staples store parking lot in Hempstead, New York and park the car. CC-2 shortly thereafter exited the Nissan and entered a light-colored Volvo occupied by an individual subsequently identified as GREGORY KONNY, the defendant.[3] At approximately 5:35 p.m., CC-2 exited the Volvo carrying a shopping bag, which CC-2 subsequently placed in the back seat of the Nissan. At some point shortly thereafter, CC-2 got into the Nissan and left the Staples parking lot.

   d. Approximately 15 minutes later, CC-2 placed a call to CC-1, which call was intercepted over a judicially-authorized wiretap. During the call, CC-2 told CC-1, in sum and substance, that CC-2 had hit traffic on his way back to CC-1's residence in Manhattan. At approximately 7:02 p.m., CC-2 called CC-1 and informed CC-1 that CC-2 had arrived at CC-1's residence and was going to park his car to come inside.

   e. Based on the foregoing, and my training experience, and involvement in this investigation, I believe that during the above-described transaction, KONNY provided controlled substances, including oxycodone, to CC-2, which CC-2 in turn provided to CC-1 for redistribution.

## The Pharmacy Distribution Scheme

*The Defendant Orders Thousands of Oxycodone Pills and Unlawfully Distributes Them*

 8. Based on my participation in this investigation, and my review of DEA licensing records, I am aware that GREGORY KONNY, the defendant, has been the owner, operator, and sole pharmacist of the Pharmacy since on or about May 18, 2017.

 9. Based on my participation in this investigation, my conversations with other law enforcement officers, and my review of documents and reports obtained from, among other places, the New York State Bureau of Narcotic Enforcement ("BNE"), I have

---

[3] Based on my discussions with law enforcement agents who reviewed records maintained by the New York State Department of Motor Vehicles ("DMV"), I am aware that the license plate for the light-colored Volvo was registered to KONNY. Moreover, a law enforcement agent performing surveillance of the Volvo viewed a DMV photograph of KONNY and believes that the individual who met with CC-2 in the Volvo was KONNY.

4

learned, among other things, the following:

       a. Between on or about May 23, 2017 and on or about November 27, 2018, the Pharmacy ordered approximately 29,600 30-milligram tablets of oxycodone.

       b. During that same time period, the Pharmacy did not dispense a single 30-milligram tablet of oxycodone pursuant to a prescription.

10. On various dates throughout the course of this investigation, I and other law enforcement agents conducted surveillance in the vicinity of the Pharmacy. During that surveillance, we have observed GREGORY KONNY, the defendant, and others meet with individuals outside the Pharmacy and provide them with packages that I believe, based on my training and experience and participation in this investigation, contained oxycodone. For example:

       a. On or about January 10, 2018, at approximately 12:10 p.m., I observed a sedan park in the vicinity of the Pharmacy. I then observed an individual ("Individual-1") exit the Pharmacy, cross the street, and approach the sedan. Individual-1 entered the sedan for a short period of time and exited shortly thereafter. Individual-1 then returned to the Pharmacy. A few minutes later, Individual-1 again left the Pharmacy holding a white plastic shopping bag that appeared to be weighted. Individual-1 then entered the sedan for a short time and then left the sedan without the white plastic shopping bag.

       b. Later that day, at approximately 12:20 p.m., I observed a blue sedan with Virginia license plates park in the vicinity of the Pharmacy. I then observed Individual-1 approach the blue sedan, enter the blue sedan for a short period of time, and exit shortly thereafter. Individual-1 then returned to the Pharmacy. A few minutes later, Individual-1 again left the Pharmacy holding a white plastic shopping bag. Individual-1 then entered the blue sedan for a short time and left the blue sedan without the white plastic shopping bag.

       c. On or about February 13, 2018, at approximately 1:10 p.m., law enforcement agents observed a grey Nissan Altima park in front of the Pharmacy. An individual ("Individual-2") exited the Nissan and met with KONNY on the sidewalk in front of the Pharmacy. After a short period of time, Individual-2 re-entered the Nissan Altima, which then drove away from the Pharmacy. Law enforcement agents observed that the Nissan Altima stopped approximately two blocks away from the Pharmacy. After the Nissan Altima drove away, KONNY was seen entering the

Pharmacy and then exiting the Pharmacy holding a cardboard box. KONNY placed the cardboard box in his light-colored Volvo, see supra ¶ 7.c., drove approximately two blocks away, and then stopped in the vicinity of the Nissan Altima. KONNY then exited his vehicle with the cardboard box in hand and approached the Nissan Altima. KONNY met with Individual-2 near the Nissan Altima and was observed shortly thereafter returning to KONNY's vehicle without the cardboard box.

*The November 2018 Inspection of the Pharmacy*

11. Based on my participation in this investigation, my discussions with investigators from the New York State Office of the Medicaid Inspector General ("NY-OMIG"), and my review of documents provided by NY-OMIG, I have learned the following, among other things, in substance and in part:

    a. On November 27, 2018, NY-OMIG investigators conducted an administrative inspection and medication reconciliation at the Pharmacy.

    b. During the administrative inspection, NY-OMIG investigators located in two cardboard boxes (found under a desk in the back of the Pharmacy) blank official New York State prescription pads containing the names of three separate doctors (the "Doctors"), computer-generated prescriptions, and handwritten notations associated with certain patients. Based on my training and experience and discussions with the NY-OMIG investigators, computer-generated prescriptions can reflect prescriptions communicated to a pharmacy over the phone, but blank paper prescriptions should not be found in a pharmacy as pharmacists are not qualified to write prescriptions for patients. Certain of the handwritten notations found on documents in the two cardboard boxes included: a) "1) Date filled 2/28/18; 2) if audited, they need real scripts (use [Doctor-1] blanks)"; and b) "if u get audit, change serial# (from EEE to one that was used for diff claim)."

    c. When NY-OMIG investigators questioned GREGORY KONNY, the defendant, about the contents of the two cardboard boxes containing blank prescription pads, KONNY replied in sum and substance that he could not look at the NY-OMIG investigators "straight in the face" and explain the contents of the two cardboard boxes.

    d. NY-OMIG investigators subsequently spoke to the Doctors, including Doctor-1, see supra ¶ 11.b. The Doctors stated, in substance and in part, that they did not provide their blank prescription pads to KONNY or authorize him to use them, that they did not know why their prescription pads were in the

6

Pharmacy, and that they did not sign or authorize anyone else to sign any of the prescriptions found in the Pharmacy.

e.  During the administrative inspection, NY-OMIG investigators conducted an informal medication reconciliation; that is, an onsite comparison of the amount of certain medications purchased by the Pharmacy as reflected in, among other things, wholesale purchase orders, to the amount billed or dispensed by the Pharmacy in a certain time period, as reflected in the Pharmacy's records. The NY-OMIG investigators asked KONNY to show them the Schedule II controlled substances in stock at the Pharmacy. KONNY showed NY-OMIG investigators approximately seven bottles of 30-milligram tablets of oxycodone- *i.e.*, 700 pills – that the Pharmacy had in stock (the "Seven Pill Bottles"). However, a review of the wholesale purchases of oxycodone by the Pharmacy showed that the Pharmacy had ordered at least 81 bottles of oxycodone 30-milligram tablets between January 2, 2018 and November 19, 2018. A review of the prescription dispensing history from KONNY's computer from on or about February 6, 2018 to on or about November 27, 2018, showed that, during the time frame, KONNY had filled only four prescriptions of oxycodone, which represented a total of 630 30-milligram tablets -- or seven bottles -- of oxycodone. As previously discussed, none of these prescriptions were reported to BNE, *see supra* ¶ 9, and based on my training, experience, and involvement in this investigation, I believe these prescriptions were fraudulent.

f.  When questioned about the discrepancy between the number of bottles of oxycodone ordered by the Pharmacy (81) and the number of bottles purportedly dispensed or in stock (14), KONNY showed the NY-OMIG investigators an additional 32 bottles of oxycodone, which were stored in plastic boxes, sealed with small combination locks, and located in the back room of the Pharmacy. Even with the additional 32 bottles, a shortage of approximately 35 bottles of oxycodone remained. That is, the Pharmacy had ordered approximately 35 bottles of oxycodone that were not used to fill prescriptions and were not present in the Pharmacy when NY-OMIG investigators conducted the audit.

*The December 2018 Search of the Pharmacy*

12.  On or about December 11, 2018, the Honorable Steven L. Tiscione, United States Magistrate Judge, Eastern District of New York, issued a search warrant for the Pharmacy (the "Pharmacy Warrant").

13.  Based on my participation in the search pursuant to the Pharmacy Warrant on or about December 12, 2018, and my

7

discussions with other law enforcement agents who participated in the search, I have learned, among other things:

      a. During the search, I and other law enforcement agents seized approximately 39 oxycodone 30-milligram oxycodone bottles from the Pharmacy. Of those 39 bottles, approximately 32 had been re-packaged with substances other than oxycodone 30-milligram tablets and re-sealed.

      b. Agents also recovered during the search, among other things, the following:

      i. a deposit slip for a TD Bank Account Number ending in 9260 ("9260 Account") held in the name of GREGORY KONNY, the defendant, in the amount of $311,466.98 and dated November 23, 2018. The deposit slip listed a TD Bank branch in Hempstead, New York (the "Hempstead TD Bank").

      ii. A deposit slip for a TD Bank Account Number ending in 0783 held in the name "South Franklin Pharmacy, DBA Aneddona Pharmacy" ("0783 Account") in the amount of $28,345.17 and dated November 23, 2018. The deposit slip listed the Hempstead TD Bank.

      iii. A key similar to what would be used to access a safety deposit box was found in an envelope from TD Bank along with a deposit slip book from TD Bank.

*The Defendant's Financial Records, Safety Deposit Box, and Flight from the United States*

14. Based on my review of documents from TD Bank and my conversations with other law enforcement officers who spoke with Hempstead TD Bank employees, I have learned the following, among other things:

      a. A teller at the Hempstead TD Bank ("TD Bank Employee-1") reported in sum and substance that GREGORY KONNY, the defendant, was a customer of the bank who would bring large quantities of cash to the bank.

      b. KONNY signed a lease with TD Bank on or about January 26, 2017 for a safety deposit box (the "Safety Deposit Box") held at the Hempstead TD Bank.

      c. From on or about April 11, 2017 to on or about December 7, 2017, KONNY deposited approximately $862,019 in seven cash deposits into the 9260 Account.

d.  From on or about January 29, 2018 to on or about November 29, 2018, KONNY deposited approximately $1.9 million in eleven cash deposits into the 9260 Account.

e.  A teller at the Hempstead TD Bank ("TD Bank Employee-2") reported, in sum and substance, that KONNY would come into the bank branch frequently with a pouch. While TD Bank Employee-2 was serving as a teller, TD Bank Employee-2 observed KONNY on several occasions take cash out of a pouch, make large cash deposits, and then subsequently take the pouch into the safety deposit box room. KONNY last accessed the Safety Deposit Box on or about on or about November 30, 2018 – *i.e.*, three days after the administrative and consent search that occurred on November 27, 2018 (*see supra* ¶ 11).

15.  Based on my participation in this investigation, and my discussion with a law enforcement agent who reviewed travel records from U.S. Customs and Border Protection, I have learned that, on or about December 1, 2018 -- *i.e.*, four days after the NY-OMIG investigators conducted the inspection of the Pharmacy and the day after GREGORY KONNY, the defendant, last accessed the Safety Deposit Box -- KONNY left the United States on a flight to the Ukraine.

16.  On or about January 25, 2019, the Honorable Lois Bloom, United States Magistrate Judge, Eastern District of New York, issued a search warrant for the Safety Deposit Box. Based on my conversations with a law enforcement agent who executed the warrant that same day, I am aware that the Safety Deposit Box was empty.

17.  Based on the foregoing, and my training and experience and participation in other investigations involving illegal dispensing of controlled substances, I believe that GREGORY KONNY, the defendant, was depositing some of the cash proceeds from his illicit oxycodone distribution scheme in his TD Bank accounts, and storing some of those proceeds in the Safety Deposit Box. I further believe that, three days after the NY-OMIG inspection of the Pharmacy, KONNY emptied the contents of the Safety Deposit Box and brought the cash to Ukraine.

WHEREFORE, the deponent respectfully requests that GREGORY KONNY, the defendant, be imprisoned or bailed, as the case may be.

*[signature]*

MICHAEL D. MULLER
Special Agent
Drug Enforcement Administration

Sworn to before me this
March 26th, 2019

*[signature]*

THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK